I'm Charles Kozak representing the Arndells. This is, I'm sure you're realizing, a complex set of facts and law. We don't have time to go into all of that. There was a preliminary issue that we raised with Pardon me? There was a preliminary issue, jurisdictional issue Oh yes. That we raised with Right. And we did submit a brief on that. Yes. Why are you It looks like there's, you know, presumptive. I read the declaration that was submitted. I understand the detail. All the circumstances. But it still seems like, you know, it's presumptively collusive, the assignment. I don't really think that was the intention. I think he thought it would be easier to handle if he took it over personally from his corporations because they were defunct. They hadn't functioned since 2007. So that's, he's a resident of California, has been for the last 30 years. But you still have this presumption of the law. And should this not be, this what, the various factors. And I think it's interesting to see that that presumption is over the top. The fact that someone can do something that's partial to what the law is. Assignment. The time he gave the assignment, the date, the date. Whether the assignment was put up by consideration or not. Maybe they weren't. When in time did they consider this? Well, that's the best we can do. I mean, we told the court exactly what happened. My question. Do you want us to proceed with the other? I just wonder if you had anything else to say about that preliminary. Pardon me? I'm sorry. I only raised it because I just wanted to see if there was anything else you had to offer. Other than the declaration. No, we don't have anything. We'll have to decide how to deal with that. Let's just assume for a moment that there is. Go ahead and let's hear yours. Well, we've briefed most of the points. And I don't want to reiterate all of those. I'm sure that we've covered them. The primary issue on the merits of the deal, that's the limitation issue, right? That's correct. And whether or not the assistant corporate in terms of the state of the matter, interpretation of the medical malpractice, we're not now in your position that there's something wrong with that. Is that right? Yes. Tell us what's wrong with that. Okay. Well, we think that the statute provides in a legal malpractice case that if there's concealment, that tolls the statute. And what we found, and I must say there were like 20. But concealment is also implicated. Yeah. I think that medical malpractice statute may be a little bit different in that once you have the facts that indicate that there has been medical malpractice. Right. And if there is concealment, I think it tolls the statute in both situations, medical and legal, but definitely in legal. I mean, in 11-201-2, if you have active concealment, you have tolling of the statute until the concealment is revealed. And in this case, what we found was that Mr. Arndell was told way back in 2003 that he had to settle his case because he didn't have an expert. And, in fact, he did have an expert. And, in fact, we discovered that when we finally got the documents from the defendants. There's 20 bankers' boxes of those documents. I had to dig through all of those documents, and eventually I did find the deposition of this expert. You may have some factors that postdate the date of February 26, 2000, but you have a lot that was on the plate at that time. I mean, $80 to $70 million, $70 million to $75 million. That was the only time February 26. And, of course, the pressure just on Arndell to settle, meaning that they would hand the trial, settle the SCA lawsuit, and negotiate identification with Mr. Arndell. My second point is that there was a lot there that was in place at that time. Arguably, Arndell was going to have to do with the statute. In fact, there were some subsequent factors that we found out. Does that really conclude the murder of Mr. Arndell? Do you think that there was enough evidence that Arndell was going to have to do with the statute? I really believe so, because had Mr. Arndell known that there was an expert that had been deposed, that he paid $10,000 for, that that expert's deposition was very favorable to his case, he would never have agreed to that settlement. That's a very relevant factor in any litigation. That's – he was told – Let me ask you this about this concealment issue. The district court actually considered it as a dismissal order, the concealment, right? Yes. And he laid out the test. He said, well, you kind of meet the first prong. There's some other information here. I think there are three prongs in the parts of the test. At least two. Anyway, he says there was insufficient – in the second – in this first amended complaint or the amended complaint, the consolidated complaint that he required you to file, he said that there was insufficient facts alleged in the complaint to meet the test. I don't think so. I think if you go back and review the record, he'll say that there was sufficient facts to indicate concealment, but that Arndell had – the burden was on him to go forward and to investigate and to find out and flesh out those concealments. But he said that you just didn't allege enough facts. I think – I think that's wrong, Your Honor. I think the judge did find that there was evidence of concealment. He says plaintiffs have – plaintiffs have also failed to plead facts which demonstrate that the court should toll the statute of limitations for periods of concealment. Failed to plead facts. But we didn't. We pled sufficient facts, I believe, and I think he's wrong about that if that's really what he was holding. Well, what – he lays out the test as the defendant intentionally withheld information that was holding would have hindered a reasonably diligent person from finally filing And he says you didn't plead facts as to that second problem. That could be. He's saying that we didn't – explain why we didn't pursue the concealment of those facts. If he had given – if he had given you leave to amend, what would you have additionally alleged to satisfy that requirement? I would say that due to the fact that Robeson Law Firm did not permanently come forward and tell him at any point in this entire litigation that they had committed malpractice and that he had a – should have an opportunity to seek separate counsel, that they had a conflict of interest from the very beginning. How does that allegation of conflict of interest play in the malpractice? Well, there's three entities here. There's Jessardale, there's JACC, which is Jessardale Construction, and there's Hidden Meadows Corporation. Hidden Meadows Corporation – Didn't they all have a unity of interest? No. Why not? Hidden Meadows – because Hidden Meadows owed JACC $11 million. When they got into this project, because of Stantec's negligence in providing the proper soils report, Hidden Meadows went ahead and did all of this construction to correct that problem. Were these truly independent corporations? Yes. Yes, they were. Hidden Meadows – Did they respect the corporate effort? Well, that was a matter of interpretation by the judge later, who said they were alter egos. That's where the real negligence comes in, because the Robeson law firm told Jessardale he didn't have to worry about the alter ego. They would defend him on that issue, and if he just would allow an indemnification agreement in the settlement agreement, as far as Hidden Meadows is concerned, that Jessardale and JACC would never be bothered. Well, that's not what happened. So your – the conflict of interest is that these two corporations should have each had their own separate counsel? Absolutely. Arndell should have had his own counsel? Yes. Even though Mr. Arndell was the president of one corporation? Absolutely. Because – Who were the officers of the other corporation? Susan Arndell, I think, was one. His daughter? Yeah, was on the officer list. But the problem here is that Hidden Meadows owed JACC $11 million. And so when Jessardale was told, don't worry about an indemnification agreement on behalf of Hidden Meadows, they're bankrupt anyway, and JACC and you personally will never be bothered by this, that was what – when later it was ruled they were alter egos, that subjected Jessardale and JACC to liability. When did they learn that – let's just assume for a moment that there should have been separate counsel. When did he learn or when did he have been unnoticed that that was the case? I don't think it's until he saw separate counsel. He just wouldn't know that there should have been separate counsel. If he had had separate counsel beginning in 2000 when this litigation started, he would have had an entirely different outcome because they would have told him, look, Hidden Meadows owes JACC $11 million. I can't represent a corporation that's in that much debt along with a corporation who has assets and you personally who have assets and tell you that you don't have to worry about it. And then down the road you get stuck with an alter ego. A lot of these corporations like this are, you know, what do they call them, closely held corporations. There really isn't a true corporate structure. For all intents and purposes, the main principle is that a corporation is just a – They were legally formed and they did the proper things as far as what's required under the law. So I would say they're – I'm confused about all this money that's been bounced around. I have a note here that issues this $11 million claim. At one point, it was a corporate entity that was owed $70,000 and then it was overturned and settled for $50,000. Didn't these folks who were put on the side of the aisle ask you what you probably think is a good way for people to put this? Is it too long-handled? Is it too basic-handed? Well, don't we – this is where we get back to what was told. Isn't that an issue of fact? I mean, what was Ardell told? Why he needed to settle this claim? He was told he didn't have a case. He was told that he had no expert. He was told that, yeah, we tried to get some guy from Colorado. Let me clarify the record. I don't have this correct. Well, it's referred to in our pleadings. We've pledged that. In the complaint? In the complaint. What exactly did you say? I mean, you say that $10,000 is a big deal, but I don't see anything that would expose the fact that the expert was going to give favorable testimony. Well, we testified that – we put it in our complaint that the expert was going to give favorable testimony. Well, that's just the general conclusion. Right, right. So what is your claim? When does the statute of limitations begin to run? I think it began to run when we got the – Let me be more specific. What is the date or the month of a year that you contend that it began to run? Well, I think it was in 2010 when we got the documents from the Robeson Law Firm and were able to go through those documents and determine that there was an expert who did give favorable testimony, and Arndell was not told about that. He was told he didn't have an expert. He had no case. He had to settle. Well, wouldn't it have been a value issue to try to have exactly what the expert thought was somewhere along the line, instead of just having one line or a complaint? You could have, I suppose, but isn't that an issue of fact? I mean, we've pled it. They didn't recute it. And this is a dismissal. They're admitting everything we say in that complaint is true, and we still don't have a cause of action. We said in that complaint we had an expert. We found it. We found the deposition. And they never told Arndell. And Arndell should have been present at that deposition. He's a very knowledgeable contractor, not a lawyer. He only has a high school education. How long did the Robeson Firm continue to represent Mr. McNamara? It was settled. That's a matter of some debate. They filed a motion to withdraw in 2009, but they didn't submit that motion, which you have to do under Washtenaw County rules. Was the case that was settled, they were counsel of record in that case, right? Correct. Was that case dismissed? I think what we call the defect suit continued on in 2008 when it was finally resolved because Arndell's insurance policy all kicked in and he had to settle all of those claims using JCC's insurance and his own insurance. Was Robinson involved in settling that part? Yes. He continued to represent Mr. Arndell? Correct. And the litigation continued on? Yes, until 2009 when they filed a motion to withdraw. That was in the defect? Yes. What happened about the other litigation involving the defect? That's the defect litigation. The first litigation was the dirt litigation where Stantec, the contractor. When did that end? That ended approximately 2006. Did that end with the dismissal? Yes. So Robinson just went from one suit to the other? Yes. Thank you. Good morning. I'm Joe Guerin and I'm here for the Robeson Felicity Sharpen Law Firm and the individually named attorneys. The underlying case was settled, I think the Court's aware, in February 2003. Was the case immediately dismissed then? I'm not sure if that part of the case was dismissed, but it was resolved via settlement. And whether or not the ministerial act of an order being entered or not, I honestly don't know the answer to that. And that's the case where the legislature was elected? Correct. Correct. The malpractice is that the attorneys settled that case for $1.45 million without authorization and without the client's knowledge. But it's alleged in the complaint that Mr. Rondell signed the settlement agreement February 26, 2003. So at that point, he had knowledge of harm. He was aware that this case had been settled without his authorization or consent. But he signed it and, in essence, ratified it. So under Nevada statute of limitations. Can you do that? I'm sorry? Can you do that? Well, never mind. I'm not going to. It's a very serious ethical issue. Yes, Your Honor. Under Nevada statute of limitations for legal malpractice, it's NRS 11-207. It says that the claim has to be filed within two years of when plaintiff discovers the malpractice or four years of the actual malpractice, whichever is sooner. And in 1998, there was a significant amendment to the statute that used to read for the discovery rule, the shorter period, that the clock began ticking within two years of when plaintiff discovers the material facts that constitute malpractice and sustains damage. In the 98th amendment, they removed that and sustains damage language. So all that the plaintiff has to know is that the lawyer breached a duty and it somehow resulted in harm. And that's what gets the clock ticking under 11-207. To the extent that plaintiff wanted to claim fraud, Nevada statute 11NR is a concealment. There's a three-year statute on that. It's 11. That's a separate statute. It's a separate statute, Your Honor. But the tolling provision that's identified in the malpractice statute talks about concealment. And Judge Jones considered the concealment. And because the plaintiffs were aware of the harm, there's no way that they could really get past the two-year statute because they were aware at that point. Even if we assume that they had properly pled it, there is a certain point in time that comes that they have to discover the malpractice. You can't sit back and wait until 2015 to get your file and say, you know what, I don't like the way that this settlement worked out in 2003, and the statute's been told because you've been sitting on my file for 12 years. So there's an obligation on the part of the plaintiff to at least take some action. And we don't ---- The firm continued to represent you. Yes. There was ongoing other matters. So was the firm being paid by the insurance company or by Nevada? Your Honor, I'm unaware of the direct compensation. But under Nevada law, even if they were paid by the insurance company, I'll concede that he ---- that the firm would have had obligations to Mr. Arndell. There was a clear, ongoing, continuing turning point. Right. The continuing representation rule ---- It moved right into the next case. Your Honor, with respect to the continuous representation rule and the statute of limitations, Nevada has never adopted the continuous representation rule. I know it exists, I think, in California. It's in California.  It's never been adopted in Nevada. And in May of this year, there was a published opinion by the Nevada Supreme Court, Libby v. Hamilton at 130 Nevada, Advanced Opinion 30, where the court was presented with the opportunity to modify the way that we look at tolling. And a medical malpractice plaintiff wanted to come in and argue a statutory tolling provision that had been adopted in California and suggest to the court that this is a good tolling provision we should have in Nevada. And the court said, listen, if it's not codified in the statute, we can't make it up. So all we have in Nevada is concealment. That's the only basis to toll. And since the plaintiff was aware of the harm, February 26, 2003, that's when the clock starts ticking. Judge, that does not change the fact that the allegations that the plaintiff made in their First Amendment complaint, the words that they chose to use, concede that they were aware of the harm, February 26, 2003. Judge, I'm equally unclear about how this somehow ties in or changes the ultimate outcome, because it won't change the harm date. The idea with a fraudulent concealment claim is that the attorney has done something and lied to the client. And ordinarily where I've seen fraudulent concealment is the attorney's committed some kind of gross error in the case, and they tell the client everything's okay, the case is still pending, and perhaps the case has been dismissed and the attorney's trying to get it reinstated. Or the attorney's just putting the client off. I don't know that that's as artfully pled in the First Amendment complaint. But even if it's true, it doesn't change the fact that February 26, 2003, is when the harm arose. And if there's one final point that I can make for your honors, you asked for a supplemental briefing on the issue of subject matter jurisdiction. And as the power went off in my hotel this morning, a light bulb came on, and in the cab as I was driving over, I pulled the Nevada statute that has to do with what happens to the assets of a corporation upon dissolution. And there's a statute, it's NRS 78.590, Paragraph 1. And the gist of the statute says that upon dissolution, the assets, the directors and officers of the company act as trustees and can prosecute claims in the name of the corporation, even if the corporation is dissolved. So I don't understand why there would have been an assignment if the corporation is authorized under Nevada statute to go ahead and pursue these actions, even though its charter had been revoked. It could have stayed in the Nevada state court. It was originally filed in the U.S. District Court. There's a question why that would have happened. Let me get back to the statute of limitations question. Judge Jones says that the claims met the first prong of the tolling requirement, but not the second. And this is what he says about the second. Plaintiff's lamented complaint is insufficient to support the second element of concealment, which is that the defendant's withholding would have hindered a reasonably diligent plaintiff from filing a timely suit. Information concealed here is immaterial to plaintiff's ability to timely file. You know, that's just a – if it's true, it's all right, but to me that's just a conclusory statement. It really doesn't tell you why it didn't hinder the claims. The point with that, Your Honor, I think is that – the plaintiff had requested the client file. That's where the information about the – what do you call it? The expert was, right? In the client file. But the gist of their claim is that it shouldn't have been settled. And if they knew that it was settled in February of 2003, the fact that they get a deposition later doesn't change the fact that the settlement occurred and they weren't happy with it then. That's when they were aware of the harm. And so when they have the appreciation of harm – No, they weren't aware of the harm because, this is one way to argue it, they didn't know the claim was worth substantially more until they saw the expert's report. But the claim isn't that the case was settled because we didn't have an expert. The claim is you settled the case without authorization. So whether or not he would have known this expert report existed would not have changed the fact that the attorneys allegedly settled without authorization. So once that settlement happened, the fact that other facts are discovered that show that it was even a worse decision, that, you know, they would have done even better, it still doesn't change the fact that they were aware of the harm. Right. Now, what you're saying is that, you know, I didn't say that, but if you parse the amended complaint, that's the only – or that's a causative active malpractice. In other words, it was settled without client authorization. That's all they allege? That's the gist of the damage claim that they have is that the case was settled without authorization. It was worth $11 million. Right. And you settled for only $1.45 million. Without authorization. Without authorization. And then there was apparently undue influence alleged to get him to sign off. Correct, to get him to sign off on documents. So whether or not he discovered an expert deposition three days later doesn't change the fact that that's when the harm occurred, when the settlement occurred. He didn't want to do it anyway, so the fact that he discovers an expert deposition doesn't change that fact. Okay. I understand your position and clarify it. Thank you.  And unless you have questions, thank you for your time. Thank you. Yes, I believe you had a minute or two. First of all, when counsel says that they just continued representing Ardell and the three corporations on other matters, it wasn't other matters. It was the defects suit, which is the same property, the same issues, the same development. And they knew when they settled this case and got that identification agreement signed by Ardell, they knew that that defect litigation was coming down the pipe. They had notice of that. When was the defect litigation? I think it started directly after 2005. They started getting told that they were going to be sued, but they had letters from the homeowners to Ardell's attorneys telling them, you are going to get sued because we see defects in the litigation. So they knew that when they got that identification agreement. So this is linked. They're very, very linked together because the ---- One of the rules, common law rules, was that the statute of limitations period doesn't begin to run until the litigation is over. Is there such a rule in Texas? There is a rule like that in Nevada. You're right, Your Honor. And I don't know if that really applies to this case, but we think that the real application here in counsel's argument that, well, Ardell would have knew there was something wrong because he settled this thing and claims it was without authorization. Well, maybe he wouldn't have signed it if he'd known that they had an expert. He would have said, no way. But he didn't know that the case was settled significantly. So I don't know about that. I don't know if that actually exists. Let me see close from that. Maybe there's some argument for that as well. I don't know. It's a little bit back and forth. And the point is ---- By the way, you agree with Mr. Guerin's, the way he reads the First Amendment complaint that, in essence, in essence, the act of malpractice was settling without authorization. That's malpractice. That's part of it. But I don't think you can exclude the fact that it was not told about how favorable his case was. Okay. Thank you, counsel. We appreciate your arguments very much. Thank you. The matter is submitted. We're going to take a ten-minute break.
judges: Block, Tashima, Paez